**UNITED STATES DISTRICT COURT**          **EASTERN DISTRICT OF TEXAS**

GLEN BEAUMONT and JARED       §
FIELDER,                      §
                              §
              Plaintiffs,     §
                              §
*versus*                      §          CIVIL ACTION NO. 1:05-CV-141
                              §
TEXAS DEPARTMENT OF           §
CRIMINAL JUSTICE,             §
                              §
              Defendant.      §

**MEMORANDUM AND ORDER**

Pending before the court is Defendant Texas Department of Criminal Justice's ("TDCJ")

Motion for Summary Judgment (#22).   TDCJ seeks summary judgment on Plaintiffs Glen

Beaumont ("Beaumont") and Jared Fielder's ("Fielder") action alleging racial discrimination in

employment and retaliation arising under Title VII of the Civil Rights Act of 1964, as amended

("Title VII"), 42 U.S.C. §§ 2000e-2000h-6.   Having reviewed the pending motion, the

submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that

summary judgment is warranted.

I.    <u>Background</u>

Plaintiffs are employed by TDCJ as correctional officers at the Gist Unit, located in

Beaumont, Texas.  Beaumont, a thirty-nine-year-old white male, first worked for TDCJ from 1997

through May 2002, when he left his employment for medical reasons.  He was subsequently

rehired in February 2004 and is currently classified as a Correctional Officer III.  In February

2006, he suffered an injury in a slip-and-fall accident while showering at the Gist Unit and remains

on leave.  Fielder, a twenty-eight-year-old white male, joined TDCJ in August 2001, after serving

a four-year tour of duty with the United States Marine Corps, and is presently ranked as a Correctional Officer IV, after receiving a promotion on August 16, 2004.

On August 9, 2004, Beaumont and Fielder, who worked the second shift, voluntarily reported early to assist Sergeant Synetha Renfro ("Renfro"), a black female, with paperwork before their scheduled shift began. Some uncertainty exists as to precisely which TDCJ employees were present at the time. Beaumont alleges that, in addition to himself, Fielder, Lieutenant Terrell Smith ("Lt. Smith"), a black male, Sergeant Wilbert Johnson ("Johnson"), a black male, and Officer Terri Babineaux ("Babineaux"), a black female, were in the office. Fielder, Lt. Smith, and Johnson recollect that Officer Denise Prevost ("Prevost"), a black female, was also in the room. While in the office, Lt. Smith posed a hypothetical question, ostensibly directed toward Johnson, Prevost, and/or Babineaux, that posited a reverse historical scenario and inquired "what it would be like if African Americans took all the whites as their slaves . . . ." Johnson, after allegedly laughing, responded that "it wouldn't never have happened because black folks, they get jealous of each other too much and they would have done something stupid and ended up as slaves anyway." Johnson also purportedly stated that, had whites been enslaved, they would still "spit out little fairies." Moreover, Lt. Smith and/or Johnson allegedly commented that African Americans would have called white slaves "wieners." Beaumont and Fielder assert that these comments were intended to ridicule them even though the question and ensuing conversation were never specifically directed at either of them. Additionally, Plaintiffs testified at deposition that Johnson and Lt. Smith made other derogatory remarks concerning Beaumont and Fielder's supposed failure to conform with traditional gender stereotypes by referring to them as "faggots," "girl Fridays," "bitches," and "good, little secretaries."

2

Beaumont asserts that he felt "angry, upset, and disappointed"—to the extent that he shed tears—as a result of these remarks. He believes that Lt. Smith was behaving in a racist fashion, but he could not decide at deposition whether Johnson was engaging in racial harassment or mere rudeness. Beaumont speculated that Johnson may have displayed racial animus by reacting with amusement to Lt. Smith's purportedly racist remarks. Fielder claims not only to have felt upset and disappointed but also to have experienced a stomachache as a physical manifestation of his anxiety stemming from the offending conversation.

Following the incident in the supervisors' office, Beaumont and Fielder claimed to be unable to work that day due to their mental turmoil. Renfro gave them permission to go home after Beaumont related to her the events that had unfolded. Plaintiffs departed the Gist Unit but, shortly after leaving the correctional facility, decided to call another supervisor at the unit to confirm that they had permission to leave for the day. Captain Kenneth Dempsey ("Dempsey"), a white male, "intercepted" the call and instructed the men to return to the facility. Plaintiffs refused to enter the unit, but they agreed to discuss the situation with Dempsey and Major Howard Winkler ("Winkler"), a white male, in a gazebo adjacent to the parking lot.

At deposition, Dempsey admitted being frustrated with Beaumont and Fielder for abandoning their posts, which he believed jeopardized the safety of other correctional officers, over remarks that he regarded as relatively trivial. Dempsey chastised Beaumont and Fielder for their actions, though the parties dispute the precise contents of his statements. Winkler expressed his opinion that Lt. Smith's remarks, while perhaps inappropriate, were not offensive. He reacted with "shock and disbelief" when he learned that Beaumont and Fielder were sufficiently offended to leave their posts. During the meeting at the gazebo, Winkler attempted to impress upon Plaintiffs the importance of loyalty and mutual obligations among correctional officers in an

3

attempt to persuade them to return to work for the day.  Beaumont and Fielder refused to return

to work, but they agreed to write statements concerning their alleged mistreatment by Lt. Smith

and Johnson.  Plaintiffs allege that Dempsey pressured them to complete the statements too quickly

by requiring them to be finished by the time he left work at 5:00 p.m., fifteen minutes later.

Winkler first informed Warden Joseph Smith ("Warden Smith"), a white male, of the

incident during a routine, morning briefing the next day.  Warden Smith considered Lt. Smith's

posing of the hypothetical, racial question to be "unprofessional" and "not appropriate."  Like

Dempsey and Winkler, Warden Smith was surprised that Plaintiffs found the question offensive,

but declined to take any action regarding their decision to leave the Gist Unit.  He decided to defer

any decision on the matter until Dempsey conducted an investigation.

Beaumont and Fielder were upset by what they perceived to be a lack of support and

fairness from their superiors.  Fielder contends that Dempsey and Winkler ignored him during the

meeting at the gazebo, were not open-minded about the incident, and had already determined that

Beaumont and Fielder "were in the wrong."  On August 17, 2004, Plaintiffs each filed

discrimination charges against TDCJ with the EEOC, alleging discrimination on the basis of race

and sex.[1]  A formal letter of instruction was eventually placed in Lt. Smith's personnel file in

response to Plaintiffs' complaints.

Plaintiffs further claim that TDCJ, through its officials, retaliated against them for

engaging in protected activity.  Beaumont asserts that TDCJ retaliated against him by not

promoting him to sergeant, through Dempsey's statements concerning the attributes needed by

---

[1] Plaintiffs also submitted extended statements to TDCJ's Equal Employment Office, which they attached as Exhibits A and B to their response to TDCJ's motion for summary judgment.  These statements, however, are unsworn and unauthenticated, thus constituting inadmissible hearsay, which the court will not consider.  *See* FED. R. EVID. 802.

4

supervisors, by the insertion of negative disciplinary remarks in his file, and by assigning him unfavorable jobs.  Fielder argues that TDCJ retaliated against him by denying and/or misplacing his requests for job training, by failing to select him for preferred job assignments, and by transferring him from an assignment in administrative segregation to one in the general population. Both Plaintiffs allege that TDCJ retaliated against them by requiring them to return to the Gist Unit after the purported harassment and also through Dempsey's criticism.  Beaumont and Fielder filed separate charges of retaliation on February 10, 2005, and February 17, 2005, respectively. Plaintiffs jointly filed this lawsuit on February 22, 2005, alleging hostile work environment racial harassment and retaliation under Title VII.  Neither Beaumont nor Fielder asserted a claim for sexual harassment, despite having included such allegations in their EEOC charges.

II.     Analysis

  A.     Summary Judgment Standard

   Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006); *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005); *Martinez v.*

*Schlumberger, Ltd.*, 338 F.3d 407, 411 (5th Cir. 2003); *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002).

"A fact is '*material*' if it '*might affect* the outcome of the suit under governing law.'" *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001) (emphasis in original) (quoting *Anderson*, 477 U.S. at 248); *see Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th Cir. 2005); *Harken Exploration Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 471 (5th Cir. 2001); *Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999); *Burgos v. Southwestern Bell Tel. Co.*, 20 F.3d 633, 635 (5th Cir. 1994). "An issue is '*genuine*' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan*, 246 F.3d at 489 (emphasis in original). Thus, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord EMCASCO Ins. Co. v. American Int'l Specialty Lines Ins. Co.*, 438 F.3d 519, 523 (5th Cir. 2006); *Cooper Tire & Rubber Co.*, 423 F.3d at 454; *Harken Exploration Co.*, 261 F.3d at 471; *Merritt-Campbell, Inc.*, 164 F.3d at 961. The moving party, however, need not negate the elements of the nonmovants' case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005); *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

Once a proper motion has been made, the nonmoving parties may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 322 n.3 (citing FED. R. CIV. P. 56(e)); *Anderson*, 477 U.S. at 256; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.11 (1986); *EMCASCO Ins. Co.*, 438 F.3d at 523; *Smith ex rel. Estate of Smith v. United States*, 391 F.3d 621, 625 (5th Cir. 2004); *Malacara v. Garber*, 353

F.3d 393, 404 (5th Cir. 2003); *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir.

1999), *cert. denied*, 528 U.S. 1160 (2000).   "[T]he court must review the record 'taken as a

whole.'"   *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting

*Matsushita Elec. Indus. Co.*, 475 U.S. at 587); *see Riverwood Int'l Corp. v. Employers Ins. of

Wausau*, 420 F.3d 378, 382 (5th Cir. 2005).   All the evidence must be construed "in the light

most favorable to the non-moving party without weighing the evidence, assessing its probative

value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.*, 98 F.3d 179,

181 (5th Cir. 1996); *see Reeves*, 530 U.S. at 150; *Lincoln Gen. Ins. Co.*, 401 F.3d at 350; *Smith*,

391 F.3d at 624; *Malacara*, 353 F.3d at 398; *Brown v. City of Houston*, 337 F.3d 539, 541 (5th

Cir. 2003); *Harken Exploration Co.*, 261 F.3d at 471; *Daniels v. City of Arlington*, 246 F.3d 500,

502 (5th Cir.), *cert. denied*, 534 U.S. 951 (2001).   The evidence of the nonmovants is to be

believed, with all justifiable inferences drawn and all reasonable doubts resolved in their favor.

*See Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 n.5 (1990) (citing *Anderson*, 477 U.S. at 255);

*Shields v. Twiss*, 389 F.3d 142, 150 (5th Cir. 2004); *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d

409, 412 (5th Cir. 2003); *Martinez*, 338 F.3d at 411; *Gowesky v. Singing River Hosp. Sys.*, 321

F.3d 503, 507 (5th Cir.), *cert. denied*, 540 U.S. 815 (2003); *Chaplin v. NationsCredit Corp.*, 307

F.3d 368, 372 (5th Cir. 2002).

Nevertheless, "'only *reasonable* inferences can be drawn from the evidence in favor of the

nonmoving party.'" *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 469 n.14

(1992) (emphasis in original) (quoting *H.L. Hayden Co. of N.Y. v. Siemens Med. Sys., Inc.*, 879

F.2d 1005, 1012 (2d Cir. 1989)).   "If the [nonmoving parties'] theory is . . . senseless, no

reasonable jury could find in [their] favor, and summary judgment should be granted." *Id.* at 468-

69.   The nonmovants' burden is not satisfied by "some metaphysical doubt as to the material facts,

by conclusory allegations, by unsubstantiated assertions," by speculation, by the mere existence of some alleged factual dispute, or "by only a scintilla of evidence." *Little*, 37 F.3d at 1075 (citations omitted); *see Anderson*, 477 U.S. at 247-48; *Warfield*, 436 F.3d at 557; *Boudreaux*, 402 F.3d at 540; *Wallace*, 80 F.3d at 1047; *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996). "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown*, 337 F.3d at 541; *see Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 332 (5th Cir. 2004); *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003); *Hugh Symons Group, plc v. Motorola, Inc.*, 292 F.3d 466, 468 (5th Cir.), *cert. denied*, 537 U.S. 950 (2002).

Summary judgment is mandated if the nonmovants fail to make a showing sufficient to establish the existence of an element essential to their case on which they bear the burden of proof at trial. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp.*, 477 U.S. at 322; *EMCASCO Ins. Co.*, 438 F.3d at 523; *Cutrera v. Board of Supervisors of La. State Univ.*, 429 F.3d 108, 110 (5th Cir. 2005); *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322-23.

B.    Title VII of the Civil Rights Act of 1964

Title VII provides that "[i]t shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92-93 (2003); *Roberson v. Alltel Info*.

8

*Servs.*, 373 F.3d 647, 651 (5th Cir. 2004).  "The purposes of Title VII are to achieve equality of employment opportunity and to make persons whole for injuries suffered on account of unlawful employment discrimination." *Floca v. Homcare Health Servs., Inc.*, 845 F.2d 108, 111 (5th Cir. 1988) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417 (1975)).

"Title VII discrimination can be established through either direct or circumstantial evidence." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (citing *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001), *cert. denied*, 535 U.S. 1078 (2002)); *accord Jones v. Robinson Prop. Group, L.P.*, 427 F.3d 987, 992 (5th Cir. 2005); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000); *see Desert Palace, Inc.*, 539 U.S. at 99.  "'Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption.'" *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 384 n.3 (5th Cir. 2003) (quoting *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002), *cert. denied*, 539 U.S. 926 (2003) (citing *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1217 (5th Cir. 1995))). "Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973)." *Russell*, 235 F.3d at 222; *see Reeves*, 530 U.S. at 142-43; *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *Laxton*, 333 F.3d at 578; *West*, 330 F.3d at 384.

Where there is no direct evidence of discrimination, the plaintiff must initially establish a *prima facie* case by satisfying a multi-factor test from which an improper motive may be inferred, thus creating a rebuttable presumption of discrimination. *See Reeves*, 530 U.S. at 142-43; *Laxton*, 333 F.3d at 578; *Russell*, 235 F.3d at 222; *Wallace*, 80 F.3d at 1047 (citing *Meinecke v. H&R Block of Houston*, 66 F.3d 77, 83 (5th Cir. 1995)); *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082,

9

1087 (5th Cir. 1994) (citing *Burdine*, 450 U.S. at 252-53).  "'To establish a *prima facie* case, a plaintiff need only make a very minimal showing.'" *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996) (quoting *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 639 (5th Cir. 1985)).

Once the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate—but not prove—a legitimate reason for its employment decision.  *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 (2003); *Reeves*, 530 U.S. at 142; *McDonnell Douglas Corp.*, 411 U.S. at 802; *Hockman*, 407 F.3d at 330; *Laxton*, 333 F.3d at 578 (citing *Methodist Hosp. Sys.*, 271 F.3d at 219); *West*, 330 F.3d at 384 (citing *Russell*, 235 F.3d at 222); *Okoye v. University of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512 (5th Cir. 2001).  "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'"  *Reeves*, 530 U.S. at 142 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)); *see West*, 330 F.3d at 384-85; *Sandstad*, 309 F.3d at 898; *Crawford v. Formosa Plastics Corp., La.*, 234 F.3d 899, 902 (5th Cir. 2000).  "The [employer] must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, '*if believed by the trier of fact*,' would support a finding that unlawful discrimination was not the cause of the employment action."  *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir. 1999) (quoting *Hicks*, 509 U.S. at 507) (emphasis in original); *accord Brown v. Bunge Corp.*, 207 F.3d 776, 781 (5th Cir. 2000).

If the employer meets its burden, "'the *McDonnell Douglas* framework—with its presumptions and burdens'—disappear[s] . . . ."  *Reeves*, 530 U.S. at 142-43 (quoting *Hicks*, 509 U.S. at 510); *see Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir.), *cert. denied*, 126 S. Ct. 798 (2005); *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005); *Laxton*, 333 F.3d at 578; *West*, 330 F.3d at 385.  "Although intermediate evidentiary burdens shift back and

10

forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 253); *accord Hicks*, 509 U.S. at 507-08; *Wheeler*, 415 F.3d at 405; *Septimus v. University of Houston*, 399 F.3d 601, 609 (5th Cir. 2005); *Laxton*, 333 F.3d at 578; *Crawford*, 234 F.3d at 902; *Vadie v. Mississippi State Univ.*, 218 F.3d 365, 372 (5th Cir. 2000), *cert. denied*, 531 U.S. 1150 (2001).

### 1.   Disparate Treatment Racial Discrimination

The court notes that Plaintiffs' complaint could conceivably be read to include allegations of disparate treatment racial discrimination in addition to racial harassment.  TDCJ has moved for summary judgment on all racial discrimination claims brought by Plaintiffs.  In their response to the summary judgment motion, however, Beaumont and Fielder do not address any potential cause of action for disparate treatment racial discrimination and, therefore, are deemed to have abandoned such a claim.  *See DIRECTV, Inc. v. Budden*, 420 F.3d 521, 525-26 (5th Cir. 2005); *Scales v. Slater*, 181 F.3d 703, 709 n.5 (5th Cir. 1999); *Garcia v. BRK Brands, Inc.*, 266 F. Supp. 2d 566, 578 n.17 (S.D. Tex. 2003); *Edwards v. Texas-New Mexico Power Co.*, 259 F. Supp. 2d 544, 547 (N.D. Tex. 2003); *see also Stearman v. Comm'r of Internal Revenue*, 436 F.3d 533, 537 (5th Cir.), *cert. denied*, 126 S. Ct. 2900 (2006); *Bursztajn v. United States*, 367 F.3d 485, 491 (5th Cir. 2004); *Yohey v. Collins*, 985 F.2d 222, 224-25 (5th Cir. 1993); *Friou v. Phillips Petroleum Co.*, 948 F.2d 972, 974 (5th Cir. 1991).  Hence, this claim, to the extent it is alleged in the complaint, has been waived and is subject to dismissal.

### 2.   Hostile Work Environment Racial Harassment

To establish a *prima facie* case of racial harassment by a supervisor with immediate or successively higher authority over the employee under Title VII, a plaintiff must show that:

     (1)     he belongs to a protected class;

     (2)     he was subject to unwelcome harassment;

     (3)     the harassment was based on race; and

     (4)     the harassment affected a term, condition, or privilege of employment.

*See Frank v. Xerox Corp.*, 347 F.3d 130, 138 (5th Cir. 2003); *Felton v. Polles*, 315 F.3d 470, 484 (5th Cir. 2002); *Celestine v. Petroleos De Venezuela SA*, 266 F.3d 343, 353-54 (5th Cir. 2001); *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999); *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir.), *cert. denied*, 516 U.S. 974 (1995).   When a supervisory employee is involved, once the plaintiff satisfies these four elements, an "'employer is subject to vicarious liability to a victimized employee.'"   *Watts*, 170 F.3d at 509 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)); *see Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764 (1998); *Ackel v. National Commc'ns., Inc.*, 339 F.3d 376, 383 (5th Cir. 2003); *Felton*, 315 F.3d at 484.

Racially "'discriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment that violates Title VII.'"   *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000) (quoting *Wallace*, 80 F.3d at 1049 n.9); *see Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Felton*, 315 F.3d at 485; *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996), *cert. denied*, 519 U.S. 1055 (1997).   "Hostile work environment" racial harassment occurs when an employer's conduct "'has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment.'"   *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986) (quoting 29 C.F.R. § 1604.11(a)).   To survive summary judgment on a hostile work environment claim based on race, the nonmovant

must create a fact issue as to each of the following elements:  "(1) racially discriminatory intimidation, ridicule and insults that are; (2) sufficiently severe or pervasive that they; (3) alter the conditions of employment; and (4) create an abusive working environment." *Walker*, 214 F.3d at 625 (citing *DeAngelis*, 51 F.3d at 594); *accord Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005); *Felton*, 315 F.3d at 485.  Whether a work environment meets these criteria depends upon the totality of the circumstances.  *See Harris*, 510 U.S. at 23; *Harvill*, 433 F.3d at 434; *Hockman*, 407 F.3d at 325; *Septimus*, 399 F.3d at 611; *Walker*, 214 F.3d at 625; *DeAngelis*, 51 F.3d at 594.

To be actionable, the challenged conduct must be sufficiently severe or pervasive as to create an environment that a reasonable person would find hostile or abusive considering all the circumstances.  *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *Septimus*, 399 F.3d at 611; *Felton*, 315 F.3d at 485*; Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002); *Allen v. Michigan Dep't of Corr.*, 165 F.3d 405, 410 (6th Cir. 1999); *Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1269 (10th Cir. 1998); *Weller*, 84 F.3d at 194.  "These circumstances may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or merely an offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23; *see National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002); *Septimus*, 399 F.3d at 611; *Walker*, 214 F.3d at 625; *Wright-Simmons*, 155 F.3d at 1269; *DeAngelis*, 51 F.3d at 594.

Conduct in the workplace that could be labeled as "harassment" will not fall within the purview of Title VII, however, if (1) it fails to affect a term, condition, or privilege of employment or (2) it is not based on a prohibited discriminatory animus.  *See Trujillo v. University of Colo. Health Sci. Ctr.*, 157 F.3d 1211, 1213 (10th Cir. 1998) (quoting *Bolden v. PRC, Inc.*,

13

43 F.3d 545, 551 (10th Cir.), *cert. denied*, 516 U.S. 826 (1995) (citing *Vinson*, 477 U.S. at 67));

*see also Felton*, 315 F.3d at 485.  "Title VII does not prohibit all verbal or physical harassment

in the workplace; it is directed only at '*discriminat[ion]* . . . because of . . . [plaintiff's protected

status].'"  *Oncale*, 523 U.S. at 80 (emphasis in original) (quoting 42 U.S.C. § 2000e-2(a)(1)); *see*

*Felton*, 315 F.3d at 485; *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001); *Haynes v.*

*BlueCross & BlueShield of Tex., Inc.*, No. Civ. A. 3:97-CV-2881-R, 2000 WL 140744, at *12

(N.D. Tex. Feb. 4, 2000).  "The complained of conduct must have . . . a racial character or

purpose to support a Title VII claim" based on race.  *Hardin v. S.C. Johnson & Son, Inc.*, 167

F.3d 340, 345 (7th Cir.), *cert. denied*, 528 U.S. 874 (1999).

Moreover, to establish a viable racial harassment claim, the plaintiff must present "'"more

than a few isolated incidents of racial enmity."'"  *Jones v. Barnhart*, 349 F.3d 1260, 1268 (10th

Cir. 2003) (quoting *Bolden*, 43 F.3d at 551 (quoting *Hicks v. Gates Rubber Co.*, 833 F.2d 1406,

1417-18 (10th Cir. 1987))); *see Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005);

*Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999); *Trujillo*,

157 F.3d at 1214.  "Title VII 'was only meant to bar conduct that is so severe and pervasive that

it destroys a protected classmember's opportunity to succeed in the workplace,' and therefore

conduct that only 'sporadically wounds or offends but does not hinder' an employee's performance

is not actionable."  *Skinner v. Brown*, 951 F. Supp. 1307, 1322 (S.D. Tex. 1996), *aff'd*, 134 F.3d

368 (5th Cir. 1997) (quoting *Weller*, 84 F.3d at 194); *see also Hockman*, 407 F.3d at 326.

"'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not

amount to discriminatory changes in the 'terms and conditions of employment.'"  *Faragher*, 524

U.S. at 788 (quoting *Oncale*, 523 U.S. at 82) (citations omitted); *see Hockman*, 407 F.3d at 328;

*Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir.), *cert. denied*, 528 U.S.

14

963 (1999).  The "'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not sufficiently alter terms and conditions of employment to violate Title VII." *Faragher*, 524 U.S. at 787 (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971), *cert. denied*, 406 U.S. 957 (1972)); *see Hockman*, 407 F.3d at 328; *Shepherd*, 168 F.3d at 874; *DeAngelis*, 51 F.3d at 595.

"While it is true that racial harassment can form the basis of both a Title VII and a § 1981 action, it is equally true that occasional or sporadic uses of racial slurs or epithets will not in and of themselves support an actionable claim of racial harassment under Title VII or § 1981." *North v. Madison Area Ass'n for Retarded Citizens—Dev. Ctrs. Corp.*, 844 F.2d 401, 408-09 (7th Cir. 1988).  Indeed, "[t]he mere utterance of a racial epithet is not indicia of discrimination under Title VII." *Boyd v. State Farm Ins. Cos.*, 158 F.3d 326, 329 (5th Cir. 1998), *cert. denied*, 526 U.S. 1051 (1999) (citing *Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277, 1295 (5th Cir. 1994), *cert. denied*, 513 U.S. 1149 (1995)).  "[E]vidence of 'routinely [made] racist remarks,'" however, may be sufficient to raise a fact issue to prevent summary judgment.  *Walker*, 214 F.3d at 626 (quoting *Wallace*, 80 F.3d at 1049).

Plaintiffs have satisfied the first two elements of a *prima facie* case of racial harassment. Beaumont and Fielder, white males, are members of a protected class based on race under Title VII, satisfying the first element.  *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 280 (1976).  Likewise, there is sufficient evidence that Plaintiffs were subjected to unwelcome harassment, thus fulfilling the second element.

The third element of a *prima facie* case of racial harassment requires proof that the harassment was based on race.  *See Walker*, 214 F.3d at 625.  A lack of racial sensitivity does not, alone, amount to actionable harassment.  *See Faragher*, 524 U.S. at 787.  At most, the

15

hypothetical posed by Lt. Smith was an insensitive, inappropriate remark in the work context.  By itself, it does not convey the requisite racial animus necessary to support a Title VII claim—the mere fact that Lt. Smith speculated about reverse historical, racial oppression does not inherently involve "racially discriminatory intimidation, ridicule, [or] insults." *Felton*, 315 F.3d at 485; *see also Oncale*, 523 U.S. at 80.  While the topic may have been uncomfortable and unsuitable for discussion in a professional work environment, Lt. Smith's abstract remarks were not overtly racist.  Additionally, Lt. Smith's and Johnson's supposed comments directed at Plaintiffs' gender roles and sexual preferences do not implicate race.  While the purported remarks questioning Plaintiffs' masculinity may have been offensive, they do not support a Title VII claim based on race.  *See Walker*, 214 F.3d at 625; *Hardin*, 167 F.3d at 345.

Nevertheless, Lt. Smith or Johnson's alleged remark that white slaves would be called "wieners" and Johnson's supposed remark that whites would "spit out little fairies" are sufficiently racially pejorative to satisfy the requirement that the harassment be racial in nature.  Moreover, a reasonable jury could find that these remarks cast negative, racial connotations on Lt. Smith's motivation underlying his otherwise relatively inoffensive hypothetical.  Accordingly, Plaintiffs have satisfied the third element of a *prima facie* case of racial harassment.

Beaumont and Fielder, however, cannot satisfy the fourth element, which requires them to proffer evidence demonstrating that the alleged harassment affected a term, condition, or privilege of employment.  *See Walker*, 214 F.3d at 625.  The episode of purported racial harassment in question is limited to events lasting only a few minutes—neither Beaumont nor Fielder has offered specific evidence concerning any explicitly racial harassment preceding or following the August 9, 2004, incident.  While Beaumont asserts that Lt. Smith referred to him as a "girl Friday" on approximately two occasions prior to August 9, 2004, such accusations

16

implicate his gender identity, rather than his race, and, in any event, are not sufficiently severe to constitute actionable harassment.  *See Hardin*, 167 F.3d at 345.

Beaumont also alleges that Lt. Smith somehow treated him differently than other correctional officers and that Lt. Smith was "not as sociable [and] not as nice" to him.  Beaumont was unwilling to state definitively that Lt. Smith generally acted in a racially harassing manner, concluding that "I just can't say that his conduct . . . or attitude [toward] me is racist or not.  I don't think I can answer that."  Likewise, Fielder asserts that there were two other occasions when "similar" incidents occurred.  Fielder, however, has not offered any evidence describing these incidents in any detail.

Viewing the evidence most favorably to Plaintiffs, it appears that they were subjected to derogatory racial remarks or insinuations on a single occasion following a hypothetical question based on a reversal of historical roles pertaining to slavery, were the targets of facially race-neutral remarks about their gender on two or three other occasions, and were treated less sociably by one of their African-American supervisors.  Plaintiffs' complaints of concrete racial hostility fall far short of actionable harassment.  *See Walker*, 214 F.3d at 625; *Vore v. Indiana Bell Tel. Co.*, 32 F.3d 1161, 1163-64 (7th Cir. 1994).  "[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII."  *Vinson*, 477 U.S. at 67.  Moreover, Plaintiffs' general allegations that Lt. Smith was not as nice to them as to others do not satisfy their burden, as "vague or conclusory allegations of discrimination or harassment are not enough to survive summary judgment."  *Huckabay v. Moore*, 142 F.3d 233, 241 (5th Cir. 1998).  In short, Title VII is not a "'general civility code.'"  *Faragher*, 524 U.S. at 788 (quoting *Oncale*, 523 U.S. at 80).

17

Hence, Beaumont and Fielder have failed to show that any purported racially-based conduct on the part of Lt. Smith, Johnson, or any other TDCJ employee was "so severe and pervasive" as to prevent them from "succeed[ing] in the workplace." *Hockman*, 407 F.3d at 326; *see also Ramsey*, 286 F.3d at 268-270; *Bolden*, 43 F.3d at 551.  Consequently, Plaintiffs are unable to establish the fourth element of a *prima facie* case of racial harassment, and summary judgment is warranted on this claim.

### 3.  Retaliation Under Title VII

Beaumont and Fielder further assert that TDCJ retaliated against them for voicing complaints about prohibited harassment.  Title VII prohibits retaliation against an employee who has engaged in activity protected by the Act:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3.

The Fifth Circuit has held that "the familiar *McDonnell Douglas* burden-shifting framework applies in Title VII retaliation cases." *Mato v. Baldauf*, 267 F.3d 444, 452 (5th Cir. 2001), *cert. denied*, 536 U.S. 922 (2002) (citing *Rios v. Rossotti*, 252 F.3d 375, 380 (5th Cir. 2001); *Rubinstein v. Administrators of Tulane Educ. Fund*, 218 F.3d 392, 401-02 (5th Cir. 2000)); *see Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 332-33 (5th Cir. 2005); *Septimus*, 399 F.3d 601 at 607-08; *Aldrup v. Caldera*, 274 F.3d 282, 286 (5th Cir. 2001); *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001).  "The framework for analyzing a retaliation claim is the same as that used in the employment discrimination context." *Rios*, 252 F.3d at 380; *accord Patrick v. Ridge*, 394 F.3d 311, 315 n.10 (5th Cir. 2004); *Perez v. Region 20 Educ. Serv. Ctr.*,

307 F.3d 318, 325 (5th Cir. 2002); *Aldrup*, 274 F.3d at 286; *Medina*, 238 F.3d at 684.

Therefore, after the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the

defendant to proffer a legitimate, nonretaliatory reason for its actions.  *See Baker v. American*

*Airlines, Inc.*, 430 F.3d 750, 754-55 (5th Cir. 2005); *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir.

2002); *Aldrup*, 274 F.3d at 286; *Rios*, 252 F.3d at 380; *Medina*, 238 F.3d at 684.  If the employer

meets its burden, the employee may nevertheless prevail by showing that the reasons given by the

employer are a pretext for retaliation.  *See Septimus*, 399 F.3d at 608; *Gee*, 289 F.3d at 345;

*Aldrup*, 274 F.3d at 286; *Rios*, 252 F.3d at 380; *Medina*, 238 F.3d at 684.   Under a pretext

theory, to carry his ultimate burden, the plaintiff must demonstrate that the adverse employment

action would not have occurred "but for" the employee's participation in the protected activity.

*See Septimus*, 399 F.3d at 608; *Mato*, 267 F.3d at 450; *Rios*, 252 F.3d at 380; *Evans v. City of*

*Houston*, 246 F.3d 344, 354 (5th Cir. 2001).

    a.    *Prima Facie* Case of Retaliation

To establish a *prima facie* case of retaliation, a plaintiff must show:

(1)    he engaged in statutorily protected activity under Title VII;

(2)    action was taken by the employer against the plaintiff that a reasonable employee would consider materially adverse; and

(3)    a causal connection exists between the protected activity and the adverse action.

*See Burlington N. & Santa Fe. Ry. Co. v. White*, ___ U.S. ___, ___, 126 S. Ct. 2405, 2415

(2006); *see also Baker*, 430 F.3d at 754; *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319

(5th Cir. 2004); *Roberson v. Alltel Info. Sys.*, 373 F.3d 647, 655 (5th Cir. 2004); *Zaffuto v. City*

*of Hammond*, 308 F.3d 485, 492 (5th Cir. 2002); *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d

318, 325 (5th Cir. 2002); *Mota v. University of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 519 (5th Cir. 2001).

"An employee has engaged in protected activity when [he] has (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." *Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 372-73 (5th Cir. 1998), *cert. denied*, 525 U.S. 1068 (1999) (quoting 42 U.S.C. § 2000e-3(a)); *accord Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 269 (2001); *Baker*, 430 F.3d at 755; *Grimes v. Texas Dep't of Mental Health & Mental Retardation*, 102 F.3d 137, 140 (5th Cir. 1996). Here, Plaintiffs indisputably engaged in protected activity when they filed a charge of employment discrimination with the EEOC. "'[F]iling an administrative complaint is clearly protected activity.'" *Walker*, 214 F.3d at 629 (quoting *Dollis v. Rubin*, 77 F.3d 777, 781 (5th Cir. 1995)). Moreover, Plaintiffs also engaged in protected activity when they reported the alleged harassment to Renfro, gave formal statements to Dempsey, and filed internal complaints with TDCJ alleging racial harassment, thus establishing the first element of a *prima face* case of retaliation. *See Ackel*, 339 F.3d at 385; *Gee*, 289 F.3d at 345-46; *Green v. Administrators of Tulane Educ. Fund*, 284 F.3d 642, 657-58 (5th Cir. 2002).

The second element of a *prima facie* case requires a plaintiff to show that he was subjected to a materially adverse action by the employer. *See White*, 126 S. Ct. at 2415; *Baker*, 430 F.3d at 754. "The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *White*, 126 S. Ct. at 2414. The Supreme Court recently repudiated the Fifth Circuit's former requirement that, to be deemed an adverse employment action, a retaliatory action must involve an ultimate employment decision such as

20

hiring, granting leave, discharging, promoting, or compensating. *See id.* at 2415; *see, e.g., Mota*, 261 F.3d at 519.  Under the standard articulated in *White*, a plaintiff need only "show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."'"  126 S. Ct. at 2415 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (quoting *Washington v. Illinois Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005))).  The provision's standard for judging harm, which refers to the reactions of a reasonable employee is, by necessity, objective.  *See id.*  The new standard is intended to "prevent employer interference with 'unfettered access' to Title VII remedial mechanisms" and to encompass situations involving conduct objectively "likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers."  *Id.* (citations omitted).  The court noted that "normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence."  *Id.* (citation omitted).

The Supreme Court "phrase[d] the standard in general terms because the significance of any given act of retaliation will often depend on the particular circumstances."  *Id.*  In other words, "[c]ontext matters."  *Id.*  Conduct that might constitute actionable retaliation toward one employee might be relatively harmless in a different context.  *See id.* at 2415-17 (explaining that "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children").  "'The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.'"  *Id.* at 2415 (quoting *Oncale*, 523 U.S. at 82-83).

Nevertheless, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* "Whether a particular [action] is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances."'" *Id.* at 2417 (quoting *Oncale*, 523 U.S. at 81 (quoting *Harris*, 510 U.S. at 23)).

Although the third element of a *prima facie* case—causation—is similar to the ultimate issue in an unlawful retaliation claim, the standard for establishing a causal link at the *prima facie* case stage is much less stringent. *See Ackel*, 339 F.3d at 385; *Gee*, 289 F.3d at 345; *Evans*, 246 F.3d at 354; *Medina*, 238 F.3d at 684-85; *Long v. Eastfield Coll.*, 88 F.3d 300, 304 n.4 (5th Cir. 1996). As the Fifth Circuit has commented:

> At first glance, the ultimate issue in an unlawful retaliation case—whether the defendant discriminated against the plaintiff *because* the plaintiff engaged in conduct protected by Title VII—seems identical to the third element of the plaintiff's prima facie case—whether a *causal* link exists between the adverse employment action and the protected activity. However, the standards of proof applicable to these questions differ significantly.

*Id.* (emphasis in original). A plaintiff need not prove that his protected activity was the sole factor in motivating the employer's challenged decision in order to establish the requisite causal link. *See Mauder v. Metropolitan Transit Auth.*, 446 F.3d 574, 583 (5th Cir. 2006), *petition for cert. filed*, 75 U.S.L.W. 3035 (U.S. July 13, 2006) (No. 06-68) (citation omitted); *Gee*, 289 F.3d at 345; *Evans*, 246 F.3d at 354; *Medina*, 238 F.3d at 684; *Long*, 88 F.3d at 305 n.4. Rather, a causal link is established when the evidence demonstrates that the employer's decision to take adverse action was based in part on knowledge of the employee's protected activity. *See Ackel*, 339 F.3d at 385-86 (citing *Medina*, 238 F.3d at 684); *Sherrod v. American Airlines, Inc.*, 132

F.3d 1112, 1122 (5th Cir. 1998).  In *Medina*, the Fifth Circuit adopted the Eleventh Circuit's method of analysis in a similar case, finding that "the 'causal link' element is satisfied when the plaintiff shows that the employment decision and his protected activity 'were not wholly unrelated.'"  238 F.3d at 684 (quoting *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir.), *cert. denied*, 474 U.S. 981 (1985)).

The consideration of three factors may be helpful in determining whether a causal link has been demonstrated at the *prima facie* case stage:  (1) the plaintiff's past disciplinary record, (2) whether the employer followed its typical policies and procedures when taking adverse action against the employee, and (3) the temporal relationship between the employee's conduct and the adverse act.  *See Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 507-08 (5th Cir. 1994) (citing *Jenkins v. Orkin Exterminating Co.*, 646 F. Supp. 1274, 1277 (E.D. Tex. 1986)).  "The timing of the adverse employment action can be a significant, although not necessarily determinative, factor."  *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1092 (5th Cir. 1995); *accord Evans*, 246 F.3d at 354.  "'Close timing between an employee's protected activity and an adverse action against [him] may provide the "causal connection" required to make out a prima facie case of retaliation.'"  *Id.* (quoting *Swanson v. General Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir.), *cert. denied*, 522 U.S. 948 (1997)); *accord Jones*, 427 F.3d at 995; *Chavez v. City of Arvada*, 88 F.3d 861, 866 (10th Cir. 1996), *cert. denied*, 519 U.S. 1056 (1997) (citing *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir.), *cert. denied*, 459 U.S. 1071 (1982)).  The temporal proximity, however, must be "very close."  *Clark County Sch. Dist. v. Breeden*, 532 U.S. at 273-74 (citations omitted).

b.      Analysis of Allegedly Adverse Acts

(1)      Requiring Plaintiffs to Return to the Gist Unit

Plaintiffs contend that TDCJ retaliated against them when Dempsey required them to return to the Gist Unit after Renfro granted them permission to leave.  The record reflects, however, that Dempsey neither forced them to fulfill their shift obligations nor punished them for leaving the Gist Unit for refusing to report for duty.  Indeed, Dempsey, albeit reluctantly, permitted Beaumont and Fielder to leave after having them prepare statements concerning their allegations of harassment.  Dempsey cannot be faulted for requesting Plaintiffs to memorialize their recollections while their memories were still fresh.  Additionally, the court notes that Plaintiffs called their superiors at the Gist Unit to gain additional authorization for their departure, indicating their own uncertainty concerning their entitlement to leave, which undermines the gravity of Dempsey's asking them to return.  While Beaumont and Fielder might have been annoyed about returning to the Gist Unit, under the circumstances, a reasonable worker would not have been dissuaded from reporting discrimination by such a request.  *See White*, 126 S. Ct. at 2415.  In fact, upon Beaumont and Fielder's return, they did just that—reported the allegedly racially offensive remarks of Lt. Smith and Johnson to Dempsey and Winkler.

(2)      Dempsey's Displeasure

Beaumont and Fielder further argue that Dempsey retaliated against them by indicating "that he was displeased with what they had done and that they had 'let their comrades down' (or words to that effect)."  Dempsey candidly acknowledged at deposition that he chastised Beaumont and Fielder for what he felt was "a weak excuse to leave."  He informed them that they "[w]ere not just hurting themselves," but also other officers by "leaving them shorthanded to pull the extra load."  The court recognizes that a prison is an inherently dangerous environment, where vigilance

24

is required at all times, and the presence of two additional correctional officers could be crucial to prevent or react to a crisis.  Indeed, Fielder conceded at deposition that a prison which is short on staff is vulnerable to the "potential for riots."

Plaintiffs have presented no evidence that Dempsey threatened or otherwise harassed them at any time after this incident.  While Beaumont and Fielder have alleged that they were subjectively wounded by Dempsey's remarks, the court's inquiry is governed by an objective standard.  *See id*.  Such observations from a superior, while perhaps lacking in empathy, would not forestall a reasonable employee from reporting discrimination.  Dempsey's comments did not constitute formal discipline and had no further impact upon Plaintiffs.  Thus, Dempsey's remarks cannot be considered materially adverse and fail to support Plaintiffs' retaliation claim.  *See id.*

### (3)   Beaumont's Lack of Promotion

In the complaint, Beaumont alleges that he was denied a promotion to sergeant on or about August 9, 2004.  He maintains that after he and Fielder returned to the Gist Unit on August 9, Dempsey advised Beaumont that he "was going to be the next sergeant, but if [he] couldn't handle this, [he] couldn't handle being a sergeant."  Beaumont explains that although the interviews for the sergeant position had already taken place, no final decision had been announced.  Clearly, the denial of a promotion in reprisal for engaging in protected activity would constitute a materially adverse employment action, even under the Fifth Circuit's former, abrogated standard.  *See Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir.), *cert. denied*, 522 U.S. 932 (1997).

In the case at bar, the record reflects that Beaumont, along with ten other candidates, interviewed for promotion on June 14, 2004, before a sergeant board chaired by Dempsey, Captain Leroy Antoine, and a representative from Human Resources.  At the conclusion of the board, Mario Martin ("Martin") was selected to fill the available sergeant position from among

25

the eleven applicants.  Two others correctional officers, Michael Jones and David Jones, were chosen to fill subsequent vacancies occurring within 180 days.  Dempsey described Beaumont's performance before the sergeant board as "below average."  It is uncontested that Warden Smith executed the certificate of compliance confirming the selections made for sergeant on June 16, 2004.  Hence, although Beaumont had not yet been notified of the results of his application to become a sergeant, the decision selecting a different candidate had already been made and approved by Warden Smith on June 16, 2004, nearly two months prior to his protected activity. Thus, the fact that Beaumont was not promoted to sergeant following the June 14 board cannot be attributed to retaliation, as no causal link exists between the adverse employment action and his protected activity.  *See Mauder*, 446 F.3d at 584-85.

Moreover, Dempsey and Winkler recall the exchange somewhat differently than Beaumont. Dempsey claims to have advised Beaumont, "You've been going up on the sergeant boards.  This ain't really the way you should handle the situation."  When asked at deposition what he meant by that comment, Dempsey clarified, "By leaving and going home."  He then explained:  "Do I believe [the allegation of harassment] needed to be looked into?  Yes, sir.  I believe that any allegation like that needs to be looked into.  But do I believe that the staff should have left and went home?  No, I don't . . . .  [Y]ou're supposed to be better and above everybody else if you're wanting to seek promotion."  At deposition, Winkler recalled that Dempsey stated:

> It helped with supervisors if they were thick-skinned, it was a benefit, because so much happens.  But I don't recall it being put in a phrase that it was going to affect.  It was more of a—more of an advice, whereas . . . you work in a . . . testy environment and you hear a lot and you see a lot and you have to a lot of times deflect things or absorb things that if you were working in an office somewhere, that you wouldn't work with two thousand convicted felons.  We supervise a large amount of people and we have to find middle ground and make decisions based on the best for the whole, and sometimes you just have to absorb some things.

26

Winkler elucidated his testimony by saying, "It wasn't like a condition, it was just, 'This would be an asset to you when you are in that position.'"

While Dempsey's statements could arguably be construed as an intimation that Beaumont's prospects for promotion at the Gist Unit were questionable, the record reflects that Beaumont never again applied for promotion and never indicated that he would have applied for future promotions in the absence of Dempsey's comments.  Moreover, Beaumont has made no showing that Dempsey would have evaluated his qualifications unfairly in future promotion boards.  At deposition, Dempsey responded affirmatively when asked whether Beaumont could "still have made sergeant" and stated that his actions would not have any "bearing on a [promotion] board."  Dempsey further testified that Beaumont "was always a good employee."  In essence, there is no evidence that Beaumont was ever denied or deterred from seeking a promotion because of his protected conduct.

Beaumont has presented no evidence of actual, objective harm suffered as a result of Dempsey's alleged remarks.  *See White*, 126 S. Ct. at 2415-16.  Indeed, were a plaintiff's subjective beliefs concerning purely speculative future promotional opportunities actionable, then it is difficult to imagine any situation in which a supervisor's less than supportive attitude concerning an employee's protected activity would not be actionable—yet, the Supreme Court expressly indicated that not all petty slights by supervisors are materially adverse.  *See id.*  In this instance, a reasonable employee would not be deterred from reporting illegal discrimination by vague, ambiguous statements from a mid-level supervisor suggesting that his actions were inconsistent with the qualities desired in a supervisor.  *See id.*  Accordingly, Beaumont cannot satisfy the second element of a *prima facie* case of retaliation based on this claim.

(4)   Beaumont's Reassignment

Beaumont further complains that he was reassigned from his preferred job of manning the "searcher's desk," sometimes referred to as "intake," "position 9320" or "utility," to performing other duties, some of which were under the direction of Lt. Smith.   Although Warden Smith indicated that some officers considered the searcher's desk to be a desirable assignment because it was a Monday through Friday job that did not require weekend work, a review of Beaumont's 2004 assignment roster reflects that he worked a number of weekends manning the searcher's desk, including:   Saturday and Sunday, February 28-29; Saturday and Sunday, March 6-7; Saturday and Sunday, March 27-28; Saturday and Sunday, April 3-4; Saturday and Sunday, April 10-11; Saturday, April 24; Saturday and Sunday, May 8-9; Sunday, May 16; Saturday and Sunday, May 29-30; Saturday, June 5; Saturday and Sunday, June 12-13; Saturday, June 26; Saturday and Sunday, July 3-4; Saturday and Sunday, July 10-11; Sunday, July 18; Saturday, July 31, and Sunday, August 1.   Nevertheless, while Beaumont did not work every day at the searcher's desk prior to August 9, 2004, the record supports his contention that it was his primary position from February 26, 2004, through August 5, 2004.  On Friday, August 6, 2004, Beaumont was assigned to "Shakedown/Escort," and on Saturday, August 7, and Sunday, August 8, Beaumont was designated the "K2 Rover."   Prior to these dates, Beaumont had worked exclusively at the searcher's desk since May 7, 2004, when he was assigned to "C-5 Picket." Before August, Beaumont worked jobs other than the searcher's desk on February 25, March 5, 9, 10, 14, 19, and 23, April 13, 14, and 16, and May 7.

While Beaumont may have preferred, for some undisclosed reason, to work at the searcher's desk, given the facts of this case, his reassignment to perform other duties was not "materially adverse."   *See White*, 126 S. Ct. at 2416-17.   The record does not reveal why

28

Beaumont favored working the searcher's desk over other job assignments.  Indeed, he has failed to proffer any evidence that the searcher's desk position was "objectively considered a better job." *Id.* at 2417.  Although some employees may have preferred a Monday through Friday schedule, Beaumont has not demonstrated that the searcher's desk position was restricted to weekdays or how a different schedule detrimentally affected him in light of his unique, personal circumstances. *See Washington*, 420 F.3d at 662.  Nor has Beaumont presented any evidence establishing that he suffered any other particular hardship as a result of the reassignment.  *See White*, 126 S. Ct. at 2417; *Washington*, 420 F.3d at 662.  Indeed, the record reflects that he worked the Friday, Saturday, and Sunday immediately preceding the August 9 incident in other positions. Accordingly, Beaumont's purported reassignment does not constitute actionable retaliatory activity under Title VII.  *See White*, 126 S. Ct. at 2415; *Sabzevari v. Reliable Life Ins. Co.*, Civil Action No. H-03-3240, 2006 WL 2336909, at *2 (S.D. Tex. Aug. 10, 2006).

Additionally, the court notes that the temporal nexus between Beaumont's alleged reassignment and his protected activity is questionable.  *See Mauder*, 446 F.3d at 584-85. Dempsey testified at deposition that Lieutenant Billy Petry ("Petry"), Beaumont's shift supervisor, made the decision to remove him from the searcher's desk on a permanent basis, supposedly due to "substandard duty performance," prior to the incident of August 9.  Although Dempsey did not concur in Petry's assessment of Beaumont's performance, Dempsey chose not to investigate the matter further or return Beaumont to the searcher's desk out of respect for Petry's authority. Beaumont acknowledged at deposition that he was not hired for a specific position and that it was a good practice for supervisors to shift correctional officers to other assignments from time to time to prevent complacency.  Later, Warden Smith briefly investigated Beaumont's reassignment, but determined that, because Beaumont had been assigned to positions other than the searcher's desk

on the three consecutive days preceding the incident, the reassignment was not retaliatory.  Hence, Beaumont cannot establish a *prima facie* case of retaliation based on his alleged reassignment because the required temporal connection is lacking and he has not presented any evidence that the searcher's desk assignment was objectively, or even subjectively, a better position such that a change in assignment was materially adverse.

(5)   <u>Beaumont's Employee Performance Log</u>

Beaumont argues that TDCJ retaliated against him when negative comments were entered in his employee performance log after August 9, 2004.  While several of these entries are dated prior to the alleged incident, Beaumont argues that these negative comments were not inserted until after he engaged in protected conduct.  On October 9, 2004, Martin, who recently had been promoted to sergeant, recorded in the performance log that Beaumont "did not properly inventory and store an offender's property."  Martin, in an entry dated October 27, 2004, reported that Beaumont was not "inside C-6 dorm where he was assigned."  Other entries noted Beaumont's absences and, on one occasion, that he went home sick.

Upon request, Beaumont was given an opportunity to review his performance log and object to unfavorable remarks which he deemed unfair.  Beaumont availed himself of this option, noting his objections to the negative comments in the performance log itself.  At least on one occasion, negative comments were redacted from Beaumont's performance log, though they may have been reinserted at a later date.  In any event, these comments were not considered formal disciplinary action by TDCJ, had no effect upon Beaumont's employment, pay, or benefits, and had no meaningful, objective impact on his day-to-day activities.  They are not of such a nature that they would dissuade a reasonable employee from engaging in protected activity under Title

VII.  Thus, the unfavorable comments contained within the performance log are not materially adverse and, consequently, are not actionable under Title VII.  *See White*, 126 S. Ct. at 2415.

(6)    Fielder's Training Requests

Fielder also alleges that TDCJ retaliated against him by misplacing and/or denying his requests for additional training.  He claims that he sought to be included in certified training courses on firearms instruction, chemical weapons instruction, and hostage negotiations.  On one occasion, he allegedly discovered that a training request that he claims to have submitted was no longer in his file.  Fielder testified at deposition that he never received any response concerning his request for firearms and chemical weapons training, even though at least one request was placed in his personnel file.  Fielder alleges that another correctional officer, Joshua McQueen ("McQueen"), was permitted to take the firearms and chemical weapons course and was ultimately promoted to sergeant.  Although his request for hostage negotiations training was denied, Fielder subsequently participated in a first-responder hostage course at the unit.  While the record is somewhat unclear, Fielder purportedly requested to take the professional certification correspondence course, but he was informed by a Human Resources representative in Beaumont that it was not being offered at that time.  He contends, however, that an acquaintance at the Estelle Unit in Huntsville advised him that the course was being offered there.

At deposition, Fielder conceded that his training requests could have been misplaced and/or denied because of the incompetence or oversight of TDCJ's administrative staff.  He also acknowledged that he is unfamiliar with TDCJ's selection process for training courses and admitted that he has received other training since engaging in protected activity.  For example, in December 2004, he received forty hours of in-service, nonsupervisor training.  Also in December 2004, he completed an American Heart Association CPR course.  In February 2005, Fielder

31

participated in an eight-hour hostage training course.  Subsequent to February 2005, he received training for coping with heat stress.

Before the Supreme Court's recent decision in *White*, the retaliatory denial of training opportunities was not actionable under Title VII in the Fifth Circuit.  *See Dollis*, 77 F.3d at 779, 782.  In *White*, the Court speculated that such an action could be materially adverse, as the denial of training that "contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination."  126 S. Ct. at 2415-16.  While Fielder may have wished to take additional training courses, there is no evidence that they would have "contribute[d] significantly" to his "professional advancement."  *Id*.  Certainly, he has not shown that these specific courses were prerequisites to becoming a sergeant or even beneficial in the selection process.  Fielder has adduced no evidence suggesting that the training that TDCJ allegedly denied him played any role in TDCJ's decision to promote McQueen.  In fact, the undisputed record evidence shows that the educational and training requirements for promotion to sergeant mandated only that a candidate have two years of service as a correctional officer and a high school diploma or equivalent degree.  Dempsey emphasized that it was also important that a candidate "be able to talk well and sell [himself or herself]."

The possibility that these courses could have assisted Fielder in gaining promotion is wholly speculative and unsupported by the record.  Likewise, he has failed to adduce any evidence that these courses would have been more beneficial to his career prospects than the additional training he received.  Nor has Fielder indicated that these courses would have provided him with training that would have been of substantial benefit to him in the course of his duties.  A reasonable employee would not be deterred from reporting illegal discrimination for fear of being deprived of the opportunity to take certain training courses as opposed to others, especially in the

32

absence of any concrete evidence that the desired training would lead to improved career prospects.  *See id.*

The record indicates that Fielder has never applied for promotion to the position of sergeant, nor does he claim that he would have applied for such a position in the foreseeable future had he been allowed to participate in the training allegedly denied him.  The court notes that Fielder was promoted to the position of Correctional Officer IV a mere week after his first exercise of protected activity.  While *White* reduced the threshold that a plaintiff must satisfy to maintain a viable claim of retaliation, it did not remove the fundamental burden from the employee to prove that he suffered a materially adverse act of retaliation.  *See id.* at 2416.  Accordingly, Fielder's allegation that TDCJ rejected his requests for certain training courses is not materially adverse and, thus, cannot satisfy the second prong of a *prima facie* case of retaliation.  *See id.* at 2415.

### (7)   Fielder's Job Assignments

Fielder also contends that TDCJ retaliated against him by denying him two lateral transfers and by failing to assign him to a post which he desired.  At some point after the August 9 incident, Fielder applied to be assigned to the "field force."  As part of the application process, he participated in a board before Dempsey, Winkler, and two other individuals.  Fielder sought the position because, for some undisclosed reason, he preferred the corresponding work schedule. He also applied for a community service position for which he, likewise, was not selected.  Fielder further complains that he was not assigned to another post within the Gist Unit, the position vacated by McQueen, which remained unfilled, because there was "too much limelight" surrounding him.  Nevertheless, TDCJ subsequently granted Fielder's request to be moved from

the second shift to the third shift, or "graveyard shift," to permit him to take his father to medical appointments in Galveston, minimizing any inconvenience to Fielder.

Although Fielder may have preferred these lateral positions, he has not provided any evidence of a particular hardship occasioned by TDCJ's failure to transfer him.  Nor has he suggested that any of these jobs offered objectively better working conditions or that they were more desirable in his specific situation.  *See White*, 126 S. Ct. at 2417.  At deposition, Fielder agreed that his move to general population from administrative segregation, which Lt. Smith supervised, was reasonable in light of his complaints about Lt. Smith's behavior.  Moreover, Fielder has made no showing that working in the administrative segregation area was objectively preferable to working with the general population inmates or that the transfer was materially adverse in view of his personal circumstances.  Accordingly, the court cannot conclude that TDCJ's decision to deny Fielder's requests for reassignment to the field force or community service positions, its refusal to assign him to McQueen's former position, or its assignment of him to the general population are materially adverse under Title VII.  *See id.*; *Sabzevari*, 2006 WL 2336909, at *2.  No evidence suggests that Fielder was reassigned to any position featuring objectively inferior working conditions.  *See White*, 126 S. Ct. at 2417.  Indeed, TDCJ granted his request to work the third shift in order to accommodate his personal family responsibilities.  Hence, summary judgment is proper as to this claim.

III.   Conclusion

Accordingly, TDCJ's motion for summary judgment is granted.  Beaumont and Fielder have failed to set forth a *prima facie* case of racial harassment and have abandoned any other claims of racial discrimination.  Furthermore, no genuine issues of material fact exist with regard to Plaintiffs' retaliation claims, as they have failed either to establish a causal nexus or to show

34

that the actions in question were materially adverse.  Thus, TDCJ is entitled to judgment as a matter of law.

SIGNED at Beaumont, Texas, this 12th day of September, 2006.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE